UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**05CRIM. 394**

- - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA              :

    - v. -                            :  <u>INDICTMENT</u>

FRANK A. DELANEY, IV,                 :  05 Cr.

    Defendant.                        :

- - - - - - - - - - - - - - - - - - - -x

[Stamp: JUDGE BAER]

[Stamp: USDC SDNY / DOCUMENT / ELECTRONICALLY FILED / DOC #: _____ / DATE FILED: APR 1 1 2005]

<u>COUNTS ONE AND TWO</u>

(Securities Fraud)

The Grand Jury charges:

### Background

1. At all times relevant to this Indictment, Bear Wagner Specialists LLC was a broker-dealer headquartered in New York, New York. During the period from January 1999 through April 2003, Bear Wagner Specialists LLC acquired or merged with other specialist firms. Bear Wagner Specialists LLC and its predecessor entities are referred to herein as "Bear Wagner." Bear Wagner was a member organization of the New York Stock Exchange ("NYSE"), a national securities exchange located in New York, New York.

2. FRANK A. DELANEY, IV, the defendant, was employed by Bear Wagner as a NYSE specialist from in or about 2000 and at all times relevant to this Indictment. DELANEY acted as the specialist for, among other companies, Bank One ("ONE") from in or about November 2000 through in or about May 2001; and Merrill

Lynch & Co., Inc. ("MER") from in or about June 2001 through in or about April 2003. DELANEY was also a Managing Director and one of four Super Captains at Bear Wagner, responsible for supervising other specialists. DELANEY further served as a NYSE Floor Official, responsible for supervising and regulating trading floor activities.

## The Role Of NYSE Specialists

3. With limited exceptions, purchases and sales of securities on the NYSE must be executed through a specialist who works on the floor of the exchange. Each security listed for trading on the NYSE is assigned to a particular specialist and is traded through an assigned "post" on the floor of the exchange where the specialist works during the trading day. To execute purchases and sales of a particular security, buyers and sellers must first present their bids to buy, and offers to sell, to the specialist assigned to that security. At all times relevant to this Indictment, orders to purchase or sell securities could be presented to a specialist in one of two ways. First, the order could be conveyed orally and in person to the specialist by a floor broker on the floor of the exchange at the specialist's post. Second, an order could be transmitted to the specialist electronically using the NYSE's Super Designated Order Turnaround System ("Super DOT"). Orders transmitted over the Super DOT system would appear on a special computer screen, often referred

to as the "display book." Each specialist had a computerized "display book" screen at his or her trading post.

4. After receiving an order to buy or sell a security, the specialist could execute or "fill" the order in one of two ways. Generally, the specialist must match any open orders to buy from one investor with an open order to sell from another investor within the same price range. Orders executed in this manner are generally referred to as "agency" or "broker" orders because the specialist simply acts as an agent matching orders from willing buyers and willing sellers. Specialists generally received no compensation for executing trades on an agency basis. As discussed more fully below, specialists were generally required by rules of the United States Securities and Exchange Commission and the NYSE to execute trades on an agency basis whenever possible.

5. In certain limited circumstances, specialists were allowed to execute trades on a "principal" or "dealer" basis when required to do so to maintain a fair and orderly market. In such circumstances, such as if there were no matching orders to sell and orders to buy within the same price range at a given time, the specialist was permitted to execute an investor's order to buy stock by selling the stock from the specialist's proprietary account, or "inventory" of stock, to the investor. Conversely, the specialist was permitted to execute an investor's order to

sell stock by buying that stock from the investor and holding the stock in the specialist's inventory.

6. In addition to their responsibility for executing purchases and sales, specialists were also responsible for reporting to the public the prices at which stocks were being bought and sold. Because of their unique position and responsibilities, specialists had certain material information advantages over all other investors and brokers. Among other things, the specialists were the first to know the price parameters of all open orders. Because of these unique advantages, specialists were subject to special rules, discussed more fully below, to prevent them from taking unfair advantage of other investors and market participants.

### Certain Applicable Rules and Regulations

7. Securities exchanges such as the NYSE are permitted to use specialists to execute orders pursuant to Section 11(b)(2) of the Securities and Exchange Act of 1934 ("the Exchange Act") and rules promulgated by the SEC thereunder. Pursuant to Exchange Act Rule 11b-1, securities exchanges must in turn have rules "stating the responsibilities of a specialist acting as a broker" as well as rules restricting a specialist's principal transactions "so far as practicable to those reasonably necessary to permit him to maintain a fair and orderly market."

8. At all relevant times, the NYSE had adopted, and had in force, rules which governed specialists' conduct and which imposed two primary duties in relation to executing orders for investors. First, pursuant to NYSE Rule 104, specialists were required to buy and sell stock on a principal or dealer basis when reasonably necessary to maintain a "fair and orderly market," i.e., when necessary to minimize any actual or reasonably anticipated short-term imbalance between supply and demand, to facilitate price continuity, or to fill customer orders when there were no available contra parties to those orders. The obligation imposed by this rule requiring a specialist to engage in principal transactions to maintain a fair and orderly market was referred to as the specialist's "affirmative obligation."

9. Second, Rule 104 also imposed a "negative obligation" that prohibited specialists from buying or selling securities on a principal or dealer basis (i.e., for or from the specialist's inventory) "unless such dealings [were] reasonably necessary to permit such specialist to maintain a fair and orderly market." As a general matter, fair and orderly markets existed, and therefore the specialist was precluded from buying or selling stock as a principal or dealer, when there were matching public orders to buy and public orders to sell in the market within the same price parameters at the same time. NYSE

Rule 92(a) further specified that specialists were precluded from buying or selling securities on a principal or dealer basis if the specialist was aware of pending orders from investors at the same price. Thus, specialists were prohibited from "trading ahead," in other words executing orders for their proprietary or dealer account ahead of existing, but as yet unexecuted, investor orders.

10. In addition to its promulgated rules, the NYSE published a "Floor Official Manual" which was widely distributed to floor officials and specialists and which set forth "an overview of the Exchange's rules and policies and certain SEC rules which govern activity on the Floor of the Exchange." In addition to describing the specialist's negative and affirmative obligations, the Floor Official Manual stated that:

> In view of the specialist's central position in the Exchange's continuous two-way agency auction market, a specialist should act as agent on behalf of orders entrusted to the specialist, hold the interests of such orders above the specialist's own interest, and properly represent each order regardless of its size or source in the marketplace to ensure the timely and best possible execution in accordance with the terms of the order and the rules and policies of the Exchange.

### The Scheme To Defraud

11. From in or about November 2000 through in or about April 2003, FRANK A. DELANEY, IV, in furtherance of a scheme to defraud purchasers and sellers of stock on the NYSE,

6

systematically violated NYSE rules and breached his duty to refrain from buying and selling stock for Bear Wagner's proprietary or dealer account while in the possession of executable customer buy and sell orders. Instead, DELANEY effected improper proprietary trades at the expense of public orders by "trading ahead" of those orders or "interpositioning" himself between these orders, as described below.

### Trading Ahead

12. When "trading ahead" of customer orders, FRANK A. DELANEY, IV, filled executable customer buy and sell orders through principal trades from Bear Wagner's dealer account "trading ahead" or "stepping in front" of executable customer orders. For example, in a declining market, a specialist "trades ahead" by filling a market buy order through selling stock from the specialist firm's proprietary account at $25.05 per share, rather than by matching it with an existing agency market sell order, and then filling the agency sell order after the proprietary trade at a lower price, such as $25.00 per share, as the price of the stock fell. By this conduct, DELANEY bought or sold stock for Bear Wagner's dealer account at the most advantageous price available, then, after the proprietary trades, executed the agency orders with which he was entrusted at a less advantageous price than he received for the dealer account.

7

### Interpositioning

13. When "interpositioning" himself between matchable, executable customer orders, FRANK A. DELANEY, IV, either (a) purchased stock for Bear Wagner's proprietary account from the customer sell orders, and then filled the customer buy orders by selling from the proprietary account at a higher price, or (b) sold stock from Bear Wagner's proprietary account to customer buy orders, and then filled customer sell orders by buying for the proprietary account at a lower price. In both of these forms of improper trading practice, hereinafter referred to as "interpositioning," DELANEY profited by capturing the spread between the lower price at which he bought stock from customer sell orders and the higher price at which he sold stock to customer buy orders and disadvantaged at least one of the parties to the transaction, by buying or selling stock for the proprietary account at the most advantageous price available and executing the customer orders at a less advantageous price.

14. For example, if market orders are present on both sides of the market, and a stock is bid for $25.00 (purchase price) and offered at $25.05 (sale price), the specialist is obligated to pair the market orders at a price between $25.00 and $25.05. If, instead, the specialist interpositions himself by buying from the sellers at $25.00 and selling to the buyers at

$25.05, the specialist fraudulently and improperly profits from the five-cent spread in violation of the applicable NYSE rules.

15. Compensation of specialists at Bear Wagner was determined in part based on the profitability of the specialist's proprietary trading of the security to which he was the assigned specialist. Accordingly, trading profits generated as a result of FRANK A. DELANEY, IV,'s trading ahead and interpositioning had a positive effect on DELANEY's compensation.

16. During the period from in or about November 2000 through in or about April 2003, FRANK A. DELANEY, IV, caused over 2,030 instances of interpositioning, resulting in illegal profits to his dealer account of more than $180,000, and over 1,510 instances of trading ahead, resulting in more than $390,000 in customer harm.

17. For example, on or about October 8, 2002, at approximately 11:41:48 a.m. (EST), DELANEY's display book showed, among other things, that at a price of $28.58, there were orders to buy 4,000 MER shares and orders to sell 1,700 shares, a majority of which had become simultaneously visible on DELANEY's display book at 11:41:47. Accordingly, at this price, orders for 1,700 shares of MER were matchable and should have been paired off before DELANEY traded for Bear Wagner's proprietary account. Rather than pairing off these orders, DELANEY interpositioned between them. First, at 11:41:51, he sold 4,000 shares from the

specialist firm's proprietary account at a price of $28.58, ahead of existing customer sell orders. DELANEY subsequently dropped the price to $28.50 and at 11:42:03, he purchased 1,800 shares for the specialist firm's proprietary account. As a result, DELANEY disadvantaged customer orders and profited approximately $144 on the purchase and sale of 1,800 shares for Bear Wagner, in approximately 15 seconds.

18. As another example, on or about November 7, 2002, at approximately 11:24:01 a.m. (EST), FRANK A. DELANEY, IV's display book showed, among other things, that at a price of $39.85, there were orders to buy 800 MER shares and orders to sell 2,700 shares, all of which had become visible simultaneously on DELANEY's display book one second earlier. Accordingly, at this price, orders for 800 shares of MER were matchable and should have been paired off before DELANEY traded for Bear Wagner's proprietary account. Rather than pairing off these orders, DELANEY interpositioned between them. First, at 11:24:01, he sold 800 shares from the specialist firm's proprietary account at a price of $39.85, ahead of existing customer sell orders. Next, DELANEY dropped the price to $39.76 and at 11:24:05, he purchased 1,300 shares for the specialist firm's proprietary account. As a result, DELANEY disadvantaged customer orders and profited approximately $72 on the purchase

and sale of 800 shares for Bear Wagner, in approximately four seconds.

## Statutory Allegations

19. On or about the dates set forth below, in the Southern District of New York and elsewhere, FRANK A. DELANEY, IV, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would and did operate as a fraud and deceit upon

persons, in connection with the purchase and sale of stock issued by the following NYSE-listed companies:

| COUNT | APPROX. DATES | COMPANY |
|---|---|---|
| ONE | June 2001 through April 2003 | Merrill Lynch & Co., Inc. |
| TWO | November 2000 through in or about May 2001 | Bank One |

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

_____
FOREPERSON

_____
DAVID N. KELLEY
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

**FRANK A. DELANEY, IV,**

Defendant.

### INDICTMENT

05 Cr.

(Title 15, United States Code,
Sections 78j(b) & 78ff; 17 CFR § 240.10b-5;
Title 18 United States Code, Section 2)

DAVID N. KELLEY
United States Attorney.

A TRUE BILL

_____ Foreperson.